IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ADAM GARFIELD BIGFORD | ) | CASE NO. 1:23-CV-00608-PAG |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL SECURITY, | ) | JENNIFER DOWDELL |
| | ) | ARMSTRONG |
| Defendant. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.       INTRODUCTION

Plaintiff Adam Garfield Bigford ("Mr. Bigford") seeks judicial review of the final decision of the Commissioner of Social Security denying his applications for Period of Disability ("POD"), Social Security Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI"). This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). (*See* ECF non-document entry dated March 22, 2023). For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.      PROCEDURAL HISTORY

On July 5, 2017 and August 3, 2017, Mr. Bigford filed his applications for POD/DIB and SSI, respectively. (Tr. 258, 260). Mr. Bigford's applications related to his major depressive disorder; bone disease; seizures; blindness in his right eye; post-traumatic stress disorder (PTSD); poor vision in his left eye; chronic pain in his back, hips, and knees; bipolar disorder; problems with his hands; attention-deficit/hyperactivity disorder (ADHD); depression; anxiety; Tourette's Syndrome; stomach issues; intermittent explosive disorder; high blood pressure; learning

disability; and chronic obstructive pulmonary disease (COPD). (Tr. 297, 309, 1916).

The Social Security Administration ("SSA") denied Mr. Bigford's applications initially and upon reconsideration. (Tr. 122-23, 166-67). Mr. Bigford requested a hearing before an administrative law judge ("ALJ"). (Tr. 203). The ALJ held a hearing on January 25, 2019, at which Mr. Bigford was represented by counsel. (Tr. 35). Mr. Bigford testified, as did an impartial vocational expert ("VE"). On April 19, 2019, the ALJ issued a written decision, finding that Mr. Bigford was not disabled. (Tr. 12). The ALJ's decision became final on April 8, 2020, when the Appeals Council declined further review. (Tr. 1).

Mr. Bigford filed a complaint in the Northern District of Ohio challenging the Commissioner's final decision, in a case captioned *Bigford v. Commissioner of Social Security*, Case No. 1:20-cv-1224-PAG. On April 8, 2021, pursuant to a stipulation between the parties, the Court issued an order remanding the case to the Commissioner for further administrative proceedings pursuant to Sentence Four of Section 205 of the Social Security Act, 42 U.S.C. § 405(g). (Tr. 1700). In the remand order, the Court ordered the ALJ to "evaluate the medical evidence of record, including all medical source opinions, evaluate Plaintiff's maximum residual functional capacity throughout the period at issue, and obtain supplemental vocational expert evidence as necessary." *Id.*

On December 9, 2021, the Appeals Council vacated the Commissioner's final decision and remanded the case to the ALJ. (Tr. 1727). In its remand order, the Appeals Council identified the issues to be considered on remand as follows:

> The decision does not contain an adequate evaluation of the claimant's mental limitations. The ALJ found the state agency psychological consultants' opinions on the claimant's social limitations as persuasive, and the opinion of the psychological consultative examiner as somewhat persuasive, (Decision, page 11), but then rendered an residual functional capacity (RFC) that was inconsistent with their opinions. The ALJ found, in relevant part, that the claimant can occasionally interact with supervisors, coworkers, and the general public (Decision, page 6).

2

Meanwhile, the reviewing psychological consultants found the claimant can interact appropriately on a superficial basis with supervisors and coworkers, but should have only limited interaction with the general public (D2A, page 15; D6A, page 16). Likewise, the psychological consultative examiner found the claimant would, in relevant part, have difficulty with stress, and working around others (D4F, page 8). There is no mention of the limitation of superficial contact in the ALJ's assessed residual functional capacity (Decision, Finding 5).

Additionally, the Council notes it was found the claimant has moderate social limitations because he went shopping, spent time with others, went to a party, and rode a dirt bike (Decision, page 5, citing D7F, pages 31-32; D7F, page 51). It was indicated that these activities indicated the claimant had a more involved social life, which shows a greater ability to interact with others (Decision, page 11).

However, that is not entirely accurate. The record indicates the claimant finding out his ex-girlfriend was misusing his credit for a home loan, getting into a fight with her son, and isolating again as a result of that stressor (D7F, page 31). The record also shows that he planned to go dirt bike riding with a friend that day, but it does not say whether he did in fact go, or how regularly he went dirt biking with this unidentified friend, but there were no other entries in the record showing dirt biking besides that entry. Similarly, the record reflects further struggles between the claimant and his ex-girlfriend, leading to the claimant going to a party where he used drugs and got into another fight (D7F, page 32). There were no other entries highlighting the claimant attending other parties. Ultimately, the citation to the claimant's involved social life does not explain the inconsistency in social limitations identified by the opinions from psychological consultants or psychological consultative examiner omitted from the decision. Therefore, further evaluation is warranted.

(Tr. 1729-30).

The Appeals Council ordered the ALJ to, among other things, "give further consideration to Mr. Bigford's maximum RFC during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations"; "evaluate the medical source opinion(s) and prior administrative findings"; and "[i]f warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base" through "hypothetical questions [that] should reflect the specific capacity/limitations established by the record as a whole." (Tr. 1730).

On October 27, 2022, the ALJ held a second hearing, this one by telephone in light of the

COVID-19 pandemic. (Tr. 1638). Mr. Bigford testified, as did the VE. On December 22, 2022, the ALJ issued a written decision, again finding that Mr. Bigford was not disabled. (Tr. 1609).

On March 22, 2023, Mr. Bigford filed his complaint, challenging the Commissioner's final decision. (ECF Doc. No. 1). Mr. Bigford asserts the following assignments of error:

(1) The ALJ erroneously failed to comply with the previous order of this Court when he failed to provide sufficient rationale regarding his failure to incorporate the findings of the treating, examining, and reviewing sources into his RFC.

(2) The ALJ found at Steps Four and Five of the Sequential Evaluation that Plaintiff could return to his past relevant work as a commercial cleaner or other jobs which exist in the national economy. This finding was contrary to the testimony of the vocational witness and was not supported by substantial evidence.

(ECF No. 7, PageID # 5521).

## III.    BACKGROUND

### A.    Personal, Educational, and Vocational Experience

Mr. Bigford was born in 1975 and was 41 years old on the alleged onset date. (Tr. 260, 1625). He has a high school diploma. (Tr. 45). He has prior work as a grinder and a cleaner. (Tr. 59).

### B.    Relevant Hearing Testimony

#### 1.    *Mr. Bigford's Testimony*

At the January 25, 2019 hearing, Mr. Bigford testified that he had moved out of his sister's home and was living with a neighbor. (Tr. 40). Mr. Bigford also testified that he only leaves his house once per week if he needs groceries and that he does not like to go outside very often. (Tr. 42). Mr. Bigford further testified that he is depressed much of the time and spends much of his day sleeping. *Id*. He also testified that he has daily panic attacks. (Tr. 52-53). Mr. Bigford testified that he does not have friends, does not belong to social groups, and does not volunteer anywhere. (Tr. 44). He also testified that he feels safer when he is at home due to past physical and sexual abuse and that it is very stressful when he leaves his house. (Tr. 50).

4

At the October 27, 2022 hearing, Mr. Bigford testified that he has been homeless for close to five years, but that a woman lets him stay with her from time to time when he cannot find a place to go. (Tr. 1646). Mr. Bigford testified that he has "pretty much cut myself off from talking to all people" and has only two or three people that he can talk to and depend on. (Tr. 1652). He also testified that he has constant nightmares due to his past traumas, including childhood sexual and physical abuse, and that he is embarrassed to go outside. (Tr. 1652-53).

Mr. Bigford testified that he is not currently receiving mental health treatment due to insurance issues, and that he is not taking medication for any conditions other than ADHD. (Tr. 1652-53). He also testified that he spends most of his day reading or watching television on his phone, although he has trouble reading books due to his vision issues. (Tr. 1654). He testified that he spends 90% of his day away from people because he does not trust anyone. (Tr. 1655). Mr. Bigford also testified that he continues to have panic attacks, though he does not experience them daily. (Tr. 1656). He also testified that he shuts himself up in a room four days out of the week. *Id*. Mr. Bigford further testified that his panic attacks can last from a couple of hours to a couple of days or longer. (Tr. 1657).

With respect to physical symptoms, Mr. Bigford testified that, since the prior administrative hearing, he was having significantly more problems with numbness, tingling, and aching in his hands and feet. (Tr. 1650). He also testified that he is not walking much anymore as a result of the pain and that he does not leave the house often. (Tr. 1650-51). He further testified that he does not sleep well as a result of stomach issues and acid reflux, and that he has trouble controlling his bowels. (Tr. 1651). He testified that he only sleeps an hour or two per night, and that he gets noticeably angry and violent due to lack of sleep. (Tr. 1658). As a result of his physical issues, Mr. Bigford testified that he can only stand for 15-20 minutes at a time before needing to sit down for half an hour; cannot walk a full block or use stairs comfortably; and cannot lift more

than 20 pounds. (Tr. 1659-60). He also testified that he has trouble gripping things with his hands and has difficulty cooking or doing the dishes. (Tr. 1660-61). Finally, Mr. Bigford testified that he experiences shortness of breath and uses four different inhalers. (Tr. 1661).

### 2.    *Vocational Expert's Testimony*

The ALJ asked the VE to consider a hypothetical individual with Mr. Bigford's age, education, and vocational background who could perform light work but could only occasionally climb ramps or stairs; could never climb ladders, ropes, and scaffolds; could frequently stoop, kneel, crouch; could occasionally crawl; was limited to performing jobs that did not require reading small print but could read larger print; must avoid unprotected heights, dangerous machinery, and commercial driving; could understand, remember, carry out, and complete simple, routine tasks with no strict production rate-based requirement; could adapt to occasional interactions with supervisors, coworkers, and the public; and could adapt to routine and occasional changes explained in advance. (Tr. 1664-65). The VE testified that the hypothetical individual could perform Mr. Bigford's past work as a commercial cleaner as that job was actually performed but not as it was generally performed. (Tr. 1665). The VE further testified that the hypothetical individual could perform jobs existing in significant numbers in the national economy, including work as a marker; cleaner, housekeeping; and classifier. (Tr. 1665-66).

In response to a question from Mr. Bigford's counsel, the ALJ testified that if the hypothetical individual were limited to occasional feeling, handling, fingering, and grasping on the right side, it would eliminate both Mr. Bigford's past work and the positions that the VE had identified. (Tr. 1667). The VE also testified that, if the hypothetical individual required an isolated work environment, it would eliminate all unskilled work. *Id*.

Mr. Bigford's counsel next asked the VE whether any of the jobs the VE had identified involved a training or probationary period. (Tr. 1667-68). The VE testified that the jobs did involve

a training period, which typically lasted for no more than approximately one week, along with a probationary period of up to 90 days. (Tr. 1668). The VE testified that the nature of the training could vary by facility, but that it was typically conducted by a coworker. *Id*. The VE also testified that "not a whole lot of training [is] required" because the jobs at issue "are very simple, routine, repetitive." *Id*. However, the VE also testified that the hypothetical individual would be expected to interact with a supervisor or coworkers more than occasionally during the training period, and that if the hypothetical individual were unable to do so, the hypothetical individual would not get the job. *Id*.

### C.    <u>Relevant Opinion Evidence</u>

#### *1.    State Agency Medical Consultants*

On October 18, 2017, Mehr Siddiqui, M.D., a state agency medical consultant, opined that Mr. Bigford could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (Tr. 94-95). Dr. Siddiqui further opined that Mr. Bigford could frequently stoop, kneel, and crouch, could occasionally climb ramps and stairs and crawl, and could never climb ladders, ropes, or scaffolds. (Tr. 95). Dr. Siddiqui also opened that Mr. Bigford had monocular vision and could not engage in commercial driving, and that he must also avoid all exposure to machinery or unprotected heights. (Tr. 95-96). On January 3, 2018, Gary Hinzman, M.D. concurred with Dr. Siddiqui's opinions on reconsideration. (Tr. 139).

On April 9, 2021, Rebecca R. Neiger, M.D. opined that Mr. Bigford had the same limitations that Dr. Siddiqui and Dr. Hinzman had previously identified. (Tr. 1708-09). On August 19, 2021, Dr. Siddiqui concurred with Dr. Neiger's opinion on reconsideration. (Tr. 1720-21).

The ALJ found that the opinions of the state agency medical consultants were generally consistent with the evidence, but that Mr. Bigford was further limited to jobs that do not require

reading small print due to vision issues with his right eye. (Tr. 1621-22).

### 2. *State Agency Psychological Consultants*

On October 17, 2017, Jaime Lai, Psy.D., a state agency psychologist, opined that Mr. Bigford had moderate limitations in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; working in coordination with or in proximity to others without becoming distracted; completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace; interacting appropriately with the general public and coworkers; accepting instruction and responding appropriately to criticism from supervisors; and responding appropriately to changes in the work setting. (Tr. 97-99). Dr. Lai further opined that Mr. Bigford could perform one-to-four step tasks in a setting with reduced distractions and without fast paced or strict production standards; could interact appropriately on a superficial basis with supervisors and coworkers but should have only limited interaction with the general public; and could perform routine and repetitive tasks in a setting with infrequent changes that could be easily explained in advance. *Id*. On February 1, 2018, Irma Johnston, Psy.D. concurred with Dr. Lai's opinions on reconsideration. (Tr. 141).

On January 17, 2021, Carl Tishler, Ph.D., opined that Mr. Bigford had the same limitations, adopting the findings from the ALJ's decision. (Tr. 1710). On July 6, 2021, Karla Delcour, Ph.D., concurred with Dr. Tishler's opinions on reconsideration. (Tr. 1721).

The ALJ found that the opinions of the state agency psychologists were generally consistent with the overall evidence. (Tr. 1622). However, the ALJ also found that Mr. Bigford could perform work that involved occasional interaction with supervisors, coworkers, and the general public. *Id*. The ALJ also found that Dr. Tishler and Dr. Delcour should not have adopted the findings from the ALJ's prior decision because that decision was on appeal to the Court at the

time. *Id*.

### 3.  *Ronald G. Smith, Ph.D.*

On October 13, 2017, Dr. Smith completed an adult clinical interview of Mr. Bigford. (Tr. 568). Dr. Smith noted that Mr. Bigford was cooperative, seemed calm during the interview, and seemed to reflect a sense of being victimized. (Tr. 572). Dr. Smith also noted that Mr. Bigford showed appropriate affect but did not express positive feelings. *Id*. Dr. Smith further noted that Mr. Bigford was alert through the interview, in good contact with reality, and had fair insight and judgment. (Tr. 573). Dr. Smith diagnosed Mr. Bigford with acute stress disorder and persistent depressive disorder with intermittent major depressive episodes, with current episode. (Tr. 574). He opined that Mr. Bigford would be capable of understanding spoken instructions but may have some difficulty with written instructions and may have difficulty carrying out instructions due to his depression, victimization, and anxiety about being around others. *Id*. Dr. Smith further opined that Mr. Bigford would have trouble maintaining adequate attention and concentration and maintaining persistence in performing simple or more complex tasks. *Id*. He also opined that Mr. Bigford may be able to respond appropriately to a supportive supervisor but would have difficulty with coworkers and would have difficulty dealing appropriately with work pressures. (Tr. 575).

The ALJ found that Dr. Smith's opinion was persuasive and generally consistent with the evidence in many respects, but that the evidence also demonstrated that Mr. Bigford could perform simple routine tasks. (Tr. 1622-23).

### 4.  *Freeland Ackley, M.D.*

On October 14, 2017, Dr. Ackley performed a consultative physical examination of Mr. Bigford in connection with his disability claim. (Tr. 576). Dr. Ackley stated that Mr. Bigford was pleasant and in no acute distress. (Tr. 580). On examination, Mr. Bigford had normal strength and range of motion, and was able to sit, stand, and walk. *Id*. Dr. Ackley opined that, as a result of Mr.

Bigford's PTSD, he could walk and stand for an hour, sit for more than an hour, and lift over 20 pounds. *Id*. Dr. Ackley further opined that Mr. Bigford did not have any substantial physical limitations and that his medical conditions seemed well controlled by his medications. *Id*.

The ALJ found that Dr. Ackley's opinion was persuasive to the extent Dr. Ackley opined that Mr. Bigford did not have any substantial physical limitations, but that Mr. Bigford could stand or walk and sit for six hours in an eight-hour day. (Tr. 1623).

### 5. *John Balk, D.O.*

Dr. Balk performed a consultative physical examination of Mr. Bigford on December 16, 2017. (Tr. 586). On examination, Mr. Bigford had diminished sensation in the third to fifth fingers on his right hand. (Tr. 590). Dr. Balk opined that Mr. Bigford could sit normally in an eight-hour workday but had mild limitations with standing and walking due to bilateral knee pain. (Tr. 590-91). Dr. Balk also opined that Mr. Bigford had moderate limitations with lifting and mild limitations with carrying, as well as limitations with bending, stooping, crouching, and squatting that limited him to performing those activities frequently. (Tr. 591). Dr. Balk further opined that Mr. Bigford could only occasionally handle, feel, grasp, or finger with his right hand due to numbness and had some visual limitations due to his decreased visual acuity. *Id*.

The ALJ found that, while Dr. Balk's opinion was sometimes vague, it was generally consistent with the medical record. (Tr. 1623). However, the ALJ found that the limitations Dr. Balk identified with respect to Mr. Bigford's ability to handle, feel, grasp, or finger with his right hand were not supported by the overall evidence. *Id*.

### 6. *Vinod Bhandari, M.D.*

On January 29, 2018, Dr. Bhandari, Mr. Bigford's psychologist, completed a mental status questionnaire regarding Mr. Bigford. (Tr. 597). Dr. Bhandari stated that Mr. Bigford was unkempt and displayed poor hygiene. *Id*. Dr. Bhandari also stated that Mr. Bigford had loud, agitated, rapid,

and pressured speech; full affect; and an irritable, anxious, sad, frustrated, and depressed mood. *Id*. Dr. Bhandari further stated that Mr. Bigford displayed symptoms of anxiety and thinking disorders, impaired concentration, and increased forgetfulness. *Id*. Dr. Bhandari diagnosed Mr. Bigford with bipolar disorder, current episode mixed, moderate; and cannabis dependence, uncomplicated. (Tr. 598). Dr. Bhandari also noted that Mr. Bigford's symptoms were minimally worse at a visit on October 11, 2017 but minimally improved at a visit on October 25, 2017. (Tr. 598).

Dr. Bhandari opined that Mr. Bigford was mildly impaired in his ability to remember, understand, and follow directions; impaired in his ability to maintain attention; and moderately to severely impaired in his ability to sustain concentration, persist at tasks, and complete them in a timely fashion. *Id*. Dr. Bhandari further opined that Mr. Bigford experienced anxiety, including panic attacks, in social situations and had poor anger management skills. *Id*. Dr. Bhandari also opined that Mr. Bigford had difficulty adjusting to change as a result of his anxiety. *Id*. Finally, Dr. Bhandari opined that Mr. Bigford would have difficulty managing his stress and frustration in a work setting and may also be unable to complete tasks due to concentration issues. *Id*.

The ALJ found that Dr. Bhandari's opinion was persuasive to the extent Dr. Bhandari opined that Mr. Bigford was impaired in his ability to maintain attention and adjust to change. (Tr. 1623). The ALJ also found, however, that Mr. Bigford was only moderately impaired in his ability to sustain concentration, persist at tasks, and complete them in a timely fashion, as well as in his ability to manage stress and frustration in a workplace setting. (Tr. 1623-24). The ALJ additionally found that Mr. Bigford was moderately impaired in his ability to remember, understand, and follow directions, rather than mildly impaired, as Dr. Bhandari had opined. (Tr. 1624).

### 7. *Dorothy Bradford, M.D.*

On March 23, 2021, Dr. Bradford performed a physical examination of Mr. Bigford. (Tr.

2373). On examination, Mr. Bigford had normal strength and range of motion in all muscle groups and an even, regular gait. (Tr. 2374). Dr. Bradford stated that Mr. Bigford displayed mild multilevel degenerative changes in the thoracic spine. *Id*. She opined that Mr. Bigford had degenerative joint disease of the thoracic and lumbar spines without radiculopathy and amblyopia of the right eye. *Id*. Dr. Bradford further opined that Mr. Bigford could perform light sedentary activity. *Id*. The ALJ found that Dr. Bradford's opinion was not persuasive because the term "light sedentary activity" was phrased in confusing language and was not a vocationally relevant term. (Tr. 1624).

### 8.   *Evelyn T. Rivera, Ph.D.*

On January 11, 2021, Dr. Rivera completed a psychological evaluation of Mr. Bigford in connection with his disability claim. (Tr. 2362). Dr. Rivera noted that Mr. Bigford did not wear a shirt to the interview and was wearing a cap on his head. (Tr. 2364). She further noted that Mr. Bigford cried profusely during the interview. *Id*. Dr. Rivera stated that Mr. Bigford's mood appeared depressed and that his energy appeared low. *Id*. She further reported that she did not observe any anxiety during the interview. *Id*. Dr. Rivera opined that Mr. Bigford was able to comprehend her questions but had difficulty completing the mini mental examination items. (Tr. 2366). She also opined that Mr. Bigford's depressed and anxious mood, hyperactivity, difficulty controlling his anger, attention difficulties, learning difficulties, and limited coping skills would affect his ability to respond appropriately to work pressures and to supervision and co-workers in a work setting. *Id*. The ALJ found that Dr. Rivera's opinion was unpersuasive because she primarily based her findings on Mr. Bigford's self-reports. (Tr. 1624).[1]

---

[1] During the administrative proceedings, Mr. Bigford also submitted an opinion from a vocational expert, Mark Heckman. (Tr. 374). Mr. Bigford does not reference Mr. Heckman's opinion in his brief and does not argue that the ALJ erred in his treatment of Mr. Heckman's opinion.

### D.   Relevant Medical Evidence

#### 1.   *Relevant Physical Evidence*

On May 16, 2017, Mr. Bigford presented to Mercy Health, complaining of a rash, weight management issues, and pain as a result of a broken right foot. (Tr. 418). Mr. Bigford stated that his orthopedist informed him that he could remove the boot from his right foot, but that he was still in significant pain as a result of his right toe. *Id*. Mr. Bigford also stated that he was on his feet much of the time when he was working and was continuing to experience pain. *Id*.

On April 16, 2018, Mr. Bigford presented at Elyria Medical Center with chest pain. (Tr. 1040). On April 17, 2018, Mr. Bigford had an echocardiogram, which was essentially normal. (Tr. 1117-18).

On May 11, 2018, Mr. Bigford underwent an overnight polysomnography to evaluate obstructive sleep apnea. (Tr. 691). The polysomnography revealed severe sleep apnea, severe O2 desaturation, and severe snoring. (Tr. 692).

On May 19, 2018, Mr. Bigford again presented to Elyria Medical Center. (Tr. 979). He was diagnosed with cholelithiasis without obstruction; hypokalemia; chronic obstructive pulmonary disease, unspecified; hypertension; gastro-esophageal reflux disease (GERD); hyperlipidemia; PTSD; nicotine dependence; and old myocardial infarction. *Id*.

On June 19, 2018, Mr. Bigford went to the Elyria Medical Center emergency room after experiencing a seizure and a fall. (Tr. 894). According to emergency medical personnel, bystanders reported that Mr. Bigford was unresponsive for 10 minutes and had seizure activity. *Id*. On examination, Mr. Bigford was awake and alert with a calm affect, and was oriented to person, place, and time. *Id*.  Mr. Bigford underwent a CT scan of his cervical spine, which revealed mild multilevel disc space narrowing and mild predominantly anterior endplate spurring, which was greatest at C5-6 and C6-7. (Tr. 927-28). Mr. Bigford also underwent a CT scan of his lumbar spine,

which revealed grade I anterolisthesis of L5 on S1 with bilateral spondylolysis of L5, mild retrolisthesis of L4 on L5 and L3 on L4, and multilevel degenerative changes most significantly involving L5/S1. (Tr. 1274-75).

On June 22, 2018, Mr. Bigford again went to Elyria Medical Center, complaining of nausea, vomiting, diarrhea, and abdominal pain, which had begun approximately one week after he received a cholecystectomy. (Tr. 831, 835). Mr. Bigford's condition was unremarkable upon examination other than nausea and vomiting. (Tr. 835). On September 3, 2018, Mr. Bigford again presented to Elyria Medical Center, complaining of swelling in his lower extremities, shortness of breath, and non-productive cough. (Tr. 804-05).

On January 28, 2019, Mr. Bigford went to Elyria Medical Center again, complaining of diarrhea. (Tr. 1576). He was diagnosed with viral gastroenteritis; chronic obstructive lung disease; and seizure disorder, metastasis to brain, malignant tumor of lung. *Id*. It was noted that Mr. Bigford had been diagnosed with lung cancer six months previously but had refused chemotherapy and was not currently receiving cancer treatment. *Id*. It was also noted that "[a]fter much discussion" Mr. Bigford was "unsure if he has lung cancer." (Tr. 1577). It was further noted that Mr. Bigford's current symptoms might be cyclic vomiting secondary to cannabis use and that Mr. Bigford was opioid dependent in the past. *Id*. Mr. Bigford underwent a CT scan of his abdomen and pelvis, which revealed multiple small nodules in both lung bases. (Tr. 1604-05). It was noted that the nodules were suspicious for metastasis and that a follow-up chest CT scan should be considered. (Tr. 1605).

On January 30, 2019, Mr. Bigford underwent a CT scan of his head and brain after experiencing a fall, the results of which were unremarkable. (Tr. 1490). A CT scan of his cervical spine revealed mild osteophyte formation at C5-C6. (Tr. 1492).

Also on January 30, 2019, Mr. Bigford presented to St. John Medical Center, complaining

14

of seizure activity. (Tr. 1540). Mr. Bigford stated that he had been discharged from Elyria, which had given him Keppra, and which he stated did not work. *Id*. The treating physician noted that Mr. Bigford was repeatedly gagging himself without vomiting. (Tr. 1543). The treating physician also reported speaking to Mr. Bigford's neurologist, who stated that Mr. Bigford was only being treated for ADHD and did not have a seizure disorder. *Id*. It was noted that Mr. Bigford's EEGs and previous neurology workups were negative for epileptic activity. (Tr. 1543-44). The neurology department reported that Mr. Bigford could be discharged, but he was admitted after his partner insisted on admission and stated that she had been on the phone with news stations. *Id*.

On January 31, 2019, it was noted that the nodules from Mr. Bigford's prior CT scan could be related to a metastatic cancer but could have other etiologies as well. (Tr. 1522). The treating physician noted that a full CT scan of Mr. Bigford's chest was required. *Id*. It was noted that Mr. Bigford expressed a desire to return home and to start the workup on an outpatient basis. *Id*.

On April 9, 2019, Mr. Bigford went to the emergency room at University Hospitals, complaining of abdominal pain, nausea, and vomiting. (Tr. 4321). Mr. Bigford reported that he had experienced nine seizure episodes over the last two days, each of which lasted four to five minutes. *Id*. He was admitted to the hospital for colitis and recurrent seizures. (Tr. 4323).

On May 5, 2019, Mr. Bigford again went to the emergency room at Elyria Medical Center, complaining of shortness of breath. (Tr. 4403). On examination, he was positive for chest pain, congestion, cough, dyspnea, and malaise. *Id*. He was diagnosed with COPD with respiratory distress, acute, and was admitted to the hospital. (Tr. 4415).

On May 24, 2019, Mr. Bigford went to the emergency room, complaining of vomiting and seizures. (Tr. 2146). It was noted that Mr. Bigford had seizure-like activity in the emergency room lobby, which lasted for one to two minutes. *Id*.

On November 25, 2019, Mr. Bigford had a CT scan of his cervical spine. (Tr. 2174). The

scan revealed straightening of the cervical spine that might reflect spasm and mild degenerative changes in the cervical and thoracic spine. *Id*.

Mr. Bigford had a follow-up visit at Mercy Health on March 5, 2019. (Tr. 4933). On examination, Mr. Bigford had full muscle strength throughout, normal reflexes, and a normal gait. (Tr. 4935). Mr. Bigford continued to display full muscle strength, normal reflexes, and a normal gait at subsequent follow-up visits. (Tr. 4922, 4925, 4932),

In February 2020, Mr. Bigford was hit by a car while riding his bicycle. (Tr. 2260). He reported pain in his upper back, left knee, and wrists, which he rated as an eight out of ten. *Id*. It was noted that Mr. Bigford had sustained an abrasion to his left knee, which was healing well. *Id*. It was also noted that Mr. Bigford's left knee showed marked swelling with associated tingling and numbness. *Id*. At a follow-up visit on June 23, 2020, Mr. Bigford had an antalgic gait and was diagnosed with neuropathic pain in his left leg, as well as hypertension and hypercholesterolemia. (Tr. 2341). He also displayed a sensory deficit in his left leg. *Id*.

On March 13, 2020, Mr. Bigford had an x-ray of his cervical spine. (Tr. 2179). The x-ray revealed degenerative changes and mild anterior spurring at several of the lower thoracic disc levels. *Id*.

On February 9, 2021, Mr. Bigford presented to Mercy Health, complaining of dry mouth, as well as tingling in his fingers and toes. (Tr. 2410). Mr. Bigford had positive Phalen and Tinel tests and was diagnosed with bilateral carpal tunnel syndrome. (Tr. 2415). On May 3, 2021, Mr. Bigford had a follow-up visit at Mercy Health. (Tr. 2432). On examination, Mr. Bigford had normal range of motion, reflexes, and muscle tone. (Tr. 2436).

On June 24, 2022, Mr. Bigford presented to Mercy Health for follow-up regarding a recent diabetes diagnosis. (Tr. 3612). It was noted that Mr. Bigford was tolerating metformin well. *Id*. On November 23, 2022, it was noted that Mr. Bigford's diabetic symptoms were improving. (Tr.

5378).

##### 2.    *Relevant Mental Health Evidence*

On December 8, 2016, Mr. Bigford presented to Mercy Health, complaining of a rash. (Tr. 439-40). On examination, Mr. Bigford displayed normal behavior and a normal mood and affect. (Tr. 441). Mr. Bigford again displayed normal behavior and a normal mood and affect at a follow-up visit on January 6, 2017. (Tr. 438).

On January 30, 2017, Mercy Health refused to fill Mr. Bigford's existing Xanax prescription. (Tr. 436). The medical note indicates that Mr. Bigford had been consistently refilling his prescription earlier than he should have been had he been taking the prescribed dosage. *Id*. The note stated that Mr. Bigford had last filled his prescription with a 30-day supply on January 14, 2017, and that "2 weeks early is not acceptable early fill." *Id*.

On January 30, 2017, Mr. Bigford presented to Mercy Health with panic attacks, stating that he had recently attempted to commit suicide. (Tr. 432). Mr. Bigford characterized his mental health problems as severe, and stated that his symptoms included feelings of sadness, emptiness, irritability, tearfulness, despair, delusions of persecution, grandeur, and somatic symptoms. *Id*. Mr. Bigford was oriented to person, place, and time and was not in distress, but was unkempt. (Tr. 434). His judgment was normal, and his affect was labile. *Id*. His speech was tangential but was not rapid or pressured. *Id*. His thought content was delusional but not paranoid, and his memory and cognition were normal. *Id*. He did not express homicidal or suicidal ideation or plans. *Id*. The treatment note states that Mr. Bigford "is very manipulative. Changes story several times. Request narcotics and antianxiety meds." *Id*. Mr. Bigford was prescribed medication and encouraged to go to the emergency room if thoughts of suicidal ideation returned. (Tr. 435-36).

Mr. Bigford had another follow-up visit at Mercy Health on March 14, 2017. (Tr. 425). On examination, Mr. Bigford's affect was labile and his speech was rapid and/or pressured. (Tr. 427).

He was hyperactive and inattentive, and his thought content was paranoid and delusional. *Id*.

On April 12, 2017, Mr. Bigford presented to Nord Counseling Center. (Tr. 535). He reported that he had a history of abuse. *Id*. Mr. Bigford also reported that he wished to receive individual counseling and medication management. *Id*. Mr. Bigford further reported that he had difficulties with focus and anger, and that he was diagnosed with ADHD at a young age. *Id*. Mr. Bigford self-reported diagnoses of bipolar disorder, PTSD, and ADHD. (Tr. 537). He also reported low energy, depression, feelings of worthlessness and guilt, and a history of suicide attempts, the last of which occurred five years previously. (Tr. 540). Mr. Bigford further reported experiencing anxiety on a daily basis, episodes of anger and aggression, and a history of trauma that continued to cause him distress. *Id*. He also reported using marijuana on a daily basis. (Tr. 538). It was noted that Mr. Bigford was alert and oriented with a depressed mood and constricted effect. (Tr. 542). Mr. Bigford was diagnosed with PTSD; major depressive disorder, moderate, recurrent episode; cannabis use disorder, mild; and alcohol use disorder, in sustained remission, severe. (Tr. 543). It was recommended that Mr. Bigford be referred to a coping skills group to address his difficulties coping with stress, which Mr. Bigford declined. *Id*.

Mr. Bigford had another follow-up session at Mercy Health on May 16, 2017. (Tr. 418). He reported that he was continuing to struggle with PTSD symptoms. *Id*. He also reported that he was not leaving the house and was instead staying in his room at his sister's house. *Id*. On examination, Mr. Bigford was tearful, and his mood was anxious and depressed. (Tr. 419). Mr. Bigford's medication was increased. (Tr. 420).

Mr. Bigford continued to attend counseling sessions Nord. (Tr. 535-67). On July 10, 2017, it was noted that Mr. Bigford lived with his sister and handled his activities of daily living independently. (Tr. 549). Mr. Bigford also reported that he had recently relapsed by using methamphetamines after more than 10 years of sobriety. (Tr. 554). He presented as depressed,

talkative, and engaged during the session. *Id*. It was noted that Mr. Bigford responded well to the support and feedback rendered, and that he was encouraged to begin attending Alcoholics Anonymous and Narcotics Anonymous meetings. *Id*. At a September 8, 2017 meeting to assist Mr. Bigford with his disability application, he presented as loud, easily angered, and easily distracted. (Tr. 552).

On August 15, 2017, Mr. Bigford had a follow-up psychological visit at Mercy Health. (Tr. 1420). Mr. Bigford stated that he had been off of his medications for a while because he had lost his insurance. *Id*. Mr. Bigford reported an inability to sleep, leg pain, weight gain, panic attacks, depression, and a recent suicide attempt. *Id*. Mr. Bigford also reported that counseling was not sufficient on its own and that he felt terrible without his medication. *Id*. On examination, Mr. Bigford's speech, behavior, judgment, and thought content were normal, but he appeared anxious and exhibited a depressed mood. (Tr. 1422).

Mr. Bigford began receiving treatment at Charak Center for Health and Wellness on September 25, 2017. (Tr. 640). Mr. Bigford reported experiencing "horrible" ADHD. *Id*. He also reported that he did not feel like himself anymore and that he had been isolating himself for the last six months. *Id*. Mr. Bigford further reported poor hygiene and appetite. *Id*. He also reported self-harming and stated that his most recent episode occurred three weeks previously. (Tr. 643). Mr. Bigford received additional mental health treatment at Charak through November 2018. (Tr. 604-51, 1297-1357, 2016-2140). During those sessions, Mr. Bigford reported continued problems with anxiety, depression, anger issues, lack of sleep, mood swings, panic attacks, inability to sleep, and self-harm. (Tr. 604, 620, 622, 628, 646, 1342, 1347).

Records from those sessions also indicate that Mr. Bigford was using drugs, including marijuana, methamphetamine and synthetic amphetamines, cocaine, heroin, fentanyl, and gabapentin (Tr. 609, 620-21, 627, 1301, 2045). On June 1, 2018, Dr. Bhandari indicated that Mr.

Bigford was seeking stimulants and had no real indication for Adderall or Ritalin. (Tr. 1318). However, on July 5, 2018, Susan Sabo, M.D. stated that the only drug in Mr. Bigford's system was marijuana and that his "stories of poly-drug abuse change often and seem very embellished for the sole purpose of shocking the interviewer." (Tr. 1311).

Mr. Bigford had a follow-up visit at Mercy Health on November 13, 2017 for a refill on his Xanax prescription. (Tr. 1462). Mr. Bigford reported that he had only been out of the house once in the previous three weeks. *Id.* He also stated that he had locked himself in the bathroom and boarded up his window during the prior weekend. *Id.*

On December 14, 2017, Mr. Bigford had another follow-up visit at Mercy Health. (Tr. 1364). He was negative for agitation, behavioral problems, confusion, decreased concentration, dysphoric mood, hallucinations, self-injury, sleep disturbance, suicidal ideas, anxiety, nervousness, and hyperactivity. *Id.* His speech, judgment, and thought content were normal, while his affect was labile. *Id.* He was withdrawn and exhibited a depressed mood. *Id.* He was diagnosed with panic disorder with agoraphobia; bipolar affective disorder, remission status unspecified; and depression, unspecified depression type. *Id.* Mr. Bigford was assessed as high risk and was given the national suicide prevention line along with the work phone number of the treating nurse practitioner. (Tr. 1365).

On January 11, 2018, Mr. Bigford had another follow-up visit at Mercy Health. (Tr. 1369). He reported that he had experienced another episode of suicidal ideation. *Id.* Mr. Bigford also reported that he wished to resume taking Xanax because of the withdrawal symptoms. *Id.* He also stated that he was continuing to use marijuana. *Id.* On examination, Mr. Bigford was positive for dysphoric mood and exhibit poor judgment, but was negative for agitation, behavioral problems, confusion, decreased concentration, hallucinations, self-injury, sleep disturbance, suicidal ideas, nervousness, anxiety, and hyperactivity. (Tr. 1371). The treating nurse practitioner stated that,

because Mr. Bigford was continuing to use marijuana, she would no longer prescribe Xanax for him. (Tr. 1372).

On April 27, 2018, Mr. Bigford reported that he had experienced a panic attack which caused him to get admitted to the emergency room. (Tr. 1381). He also stated that he had been self-harming and felt suicidal. *Id*.[2]

On September 6, 2018, Mr. Bigford visited University Hospitals for a follow-up visit regarding encephalopathy with ADHD. (Tr. 1476). Mr. Bigford reported that he threw away his prescription for methylphenidate and that he needed a refill because the medication was effective. *Id*. He was diagnosed with encephalopathy; attention deficit hyperactivity disorder, combined type; and anxiety. (Tr. 1477). His medication was renewed. (Tr. 1478).

On January 31, 2019, Mr. Bigford had a psychological consultation at St. John Medical Center. (Tr. 1504). Mr. Bigford reported that he had recently been diagnosed with lung cancer and that he also had a history of PTSD and anxiety. *Id*. Mr. Bigford reported that he had previously taken Xanax for anxiety, but that he had weaned himself off of it and was not currently taking any anxiety medications. *Id*. Mr. Bigford was diagnosed with bipolar disorder, depressed, severe; PTSD; panic disorder; and ADHD. (Tr. 1507). He was prescribed Remeron to help his depression, anxiety, insomnia, and poor appetite. *Id*.

Mr. Bigford went to Mercy Health on September 27, 2019 to re-establish care. (Tr. 2211). Mr. Bigford reported that he had frequent panic attacks and emergency room visits but denied suicidal ideations and hallucinations. *Id*. On examination, Mr. Bigford was negative for decreased concentration, dysphoric mood, and suicidal ideas, and was not nervous or anxious. (Tr. 2214). His mood and affect, behavior, judgment, and thought content were all normal. *Id*.

---

[2] Mr. Bigford asserts that treatment notes from April 30, 2018 indicate that he was a danger to himself and required inpatient admission. That is inaccurate. Treatment notes indicate that *if* Mr. Bigford posed a threat to himself, inpatient admission was required. (Tr. 1376). However, treatment notes also indicate that Mr. Bigford denied suicidal ideation and thoughts of self-harm. *Id*.

Mr. Bigford had a follow-up visit at Mercy Health on November 26, 2019, at which he reported continued anxiety and depression. (Tr. 2243). On examination, he was nervous, anxious, and positive for dysphoric mood, but negative for sleep disturbance and suicidal ideas. (Tr. 2246).

On January 25, 2022, Mr. Bigford saw Dhruv R. Patel, M.D. (Tr. 5166). On examination, Mr. Bigford was negative for behavioral problems. (Tr. 5168). It was noted that Mr. Bigford's attention deficit disorder was responding well to Adderall. (Tr. 5169). At a follow-up visit on April 12, 2022, it was noted that Mr. Bigford was doing well and was not experiencing side effects from his medication. (Tr. 5142).

## IV.    THE ALJ'S DECISION

The ALJ first determined that Mr. Bigford met the insured status requirements of the Social Security Act through March 31, 2017. (Tr. 1615). The ALJ further determined that Mr. Bigford had not been engaged in substantial gainful activity since November 15, 2016, the alleged onset date of his disability. *Id*.

The ALJ next determined that Mr. Bigford had the following severe impairments: dysfunction of major joints; spine disorder; epilepsy/seizure disorder; vision disorder in the right eye; major depressive disorder; PTSD; and polysubstance abuse. (Tr. 1615-16). The ALJ found, however, that none of Mr. Bigford's severe impairments, whether considered singly or in combination, met or medically equaled the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 1616).

The ALJ next determined that Mr. Bigford had the residual functional capacity ("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except can occasionally climb ramps and stairs, never climb ladders. ropes or scaffolds, frequently stoop, kneel, crouch and occasionally crawl; can perform jobs that do not require reading small print (like a newspaper) but can read larger print defined a size 14 font or bigger; the claimant can never work at unprotected heights, near dangerous moving

machinery, or engage in commercial driving; and the claimant is able to understand, remember and carry out and complete simple routine tasks with no strict production rate pace requirements; occasional interaction with supervisors, coworkers and the public and can adapt to routine and occasional workplace changes where changes outside the routine are explained in advance.

(Tr. 1618).

The ALJ next found that Mr. Bigford was capable of performing his past relevant work as a cleaner, commercial, as he actually performed it. (Tr. 1624). Alternatively, the ALJ determined that Mr. Bigford could perform other jobs that existed in significant numbers in the national economy, including work as a marker; cleaner, housekeeper; or classifier. (Tr. 1626). Accordingly, the ALJ determined that Mr. Bigford was not disabled. *Id*.

## V.     LAW & ANALYSIS

### A.     Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019) (quotation omitted). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Id*. (quotation omitted).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B. <u>Standard for Disability</u>

To establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a). A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet

certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.[3]

Consideration of disability claims follows a five-step review process. 20 C.F.R. §404.1520. First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) and 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) and 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d) and 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from his impairments. 20 C.F.R. § 404.1520(e) and 416.930(e). At the fourth step, if the claimant's impairment or combination of impairments does not prevent him from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g). *See Abbott*, 905 F.2d at 923.

---

[3] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in some instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq*. The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq*., corresponding to the last two digits of the DIB cite (*e.g.*, 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

C.    <u>Analysis</u>

Mr. Bigford argues that the ALJ erred in two respects: (1) acting contrary to the Court's mandate by failing to properly evaluate the medical opinion evidence; and (2) concluding that Mr. Bigford could perform his past relevant work or other jobs existing in the national economy despite a social interaction limitation that would preclude him from getting through the training period for those jobs. For the reasons that follow, I conclude that Mr. Bigford's arguments are without merit.

*1.    The ALJ's Compliance with the Court's Remand Order and Evaluation of the Opinion Evidence*

Mr. Bigford first argues that the ALJ failed to follow the Court's mandate on remand. In particular, Mr. Bigford argues that, while the Court ordered the ALJ to give additional consideration to his RFC in light of the opinion evidence, the ALJ failed to "properly evaluate and incorporate into the RFC" that opinion evidence. (ECF No. 7, PageID # 5532).

"[O]n the remand of a case after appeal, it is the duty of the lower court, or the agency from which appeal is taken, to comply with the mandate of the court and to obey the directions therein without variation and without departing from such directions." *Mefford v. Gardner*, 383 F.2d 748, 758 (6th Cir. 1967); *see also Hollins v. Massanari*, 49 F. App'x 533, 535 (6th Cir. 2002) ("Under the 'mandate rule,' administrative agencies generally are obligated to follow the mandates set forth in a federal court decision."). "Deviation from the Court's remand order in subsequent administrative proceedings is itself legal error, subject to reversal on further judicial review." *Sullivan v. Hudson*, 490 U.S. 877, 886 (1989).

Here, the Court ordered the ALJ to "evaluate the medical evidence of record, including all medical source opinions, evaluate Plaintiff's maximum residual functional capacity throughout the period at issue, and obtain supplemental vocational expert evidence as necessary." (Tr. 1700). After remand, the Appeals Council similarly ordered the ALJ to "evaluate the medical source opinion(s) and prior administrative medical findings" in accordance with the governing

regulations. (Tr. 1730).

After careful consideration, I conclude that the ALJ complied with Court's remand order. In his decision, the ALJ specifically addressed each of the medical opinions in the record, explaining the extent to which the ALJ found that opinion persuasive and the reasons for the ALJ's finding. While Mr. Bigford may disagree with the ALJ's conclusions regarding those medical opinions, that disagreement does not mean that the ALJ failed to comply with the Court's mandate. *See Dunlap v. Comm'r of Soc. Sec.*, No. 5:18CV2275, 2020 WL 5441737, at *10 (N.D. Ohio Mar. 13, 2020), *report and recommendation adopted*, 2020 WL 3118351 (N.D. Ohio June 12, 2020) (holding that ALJ complied with remand order requiring ALJ to give consideration to RFC and provide appropriate rationale where ALJ "specifically discussed the medical opinion evidence and the support for the assessed limitations"); *Sito v. Comm'r of Soc. Sec.*, No. 3:17CV1979, 2018 WL 4179457, at *23 (N.D. Ohio Aug. 31, 2018) (holding that ALJ complied with remand order where ALJ revisited opinion evidence "providing additional reasoning as to why she rejected [physician's] opinions").

Mr. Bigford is correct, however, that the ALJ's evaluation of the opinion evidence must still be supported by substantial evidence. And the thrust of Mr. Bigford's argument is that the ALJ erred in failing to incorporate certain limitations from the medical opinions and in failing to find certain opinions persuasive. I will therefore consider whether the ALJ's treatment of the medical opinions at issue is supported by substantial evidence.

Because Mr. Bigford filed his disability claim after March 27, 2017, the "treating physician" rule, pursuant to which an ALJ was required to give controlling weight to an opinion from a treating physician absent good reason not to, does not apply. *See* 20 C.F.R. § 404.1527; *Merrell v. Comm'r of Soc. Sec.*, 1:20-cv-769, 2021 WL 1222667, at *6 (N.D. Ohio Mar. 16, 2021), *report and recommendation adopted*, 2021 WL 1214809 (N.D. Ohio Mar. 31, 2021). Instead, the

current regulations stated that the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." 20 C.F.R. § 404.1520c(a).

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c). Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1). Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id*.

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. *See* 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)). The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. *See* 20 C.F.R. § 404.1520c(c)(2). "As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec. Admin.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

28

Here, Mr. Bigford argues that the ALJ erred in evaluating the opinions of the state agency psychologists as well as the opinions of Drs. Smith, Rivera, Bhandari, Balk, and Bradford. I will consider each in turn.[4]

### i.      *State Agency Psychologists*

Mr. Bigford first argues that the ALJ found the opinions of the state agency psychologists persuasive but failed to incorporate all the limitations they identified. In particular, Mr. Bigford argues that the state agency psychologists opined that Mr. Bigford could interact on a superficial basis with supervisors and coworkers, but that the ALJ restricted Mr. Bigford instead to occasional interaction with supervisors, coworkers, and the public. Mr. Bigford also argues that the state agency psychologists opined that he required reduced distractions without fast-paced or strict production standards, while the ALJ limited him only to no strict production standards. Mr. Bigford argues that, having found the opinions of the state agency psychological consultants persuasive, the ALJ was not free to disregard limitations contained in those opinions.

As the Commissioner correctly responds, Mr. Bigford's argument is based on a mistaken premise. Contrary to Mr. Bigford's argument, the ALJ did not find the opinions of the state agency psychologists persuasive in their entirety. Instead, the ALJ found that those opinions were persuasive in certain respects but were unpersuasive with respect to the social interaction limitations, as the medical record indicated that Mr. Bigford could interact occasionally with supervisors, coworkers, and the general public. (Tr. 1622). Mr. Bigford does not provide any specific argument as to why substantial evidence fails to support the ALJ's determination, and I conclude that his argument on this point is not well-taken.

---

[4] Mr. Bigford also notes that Dr. Ackley and Dr. Bradford opined that he had certain limitations. However, Mr. Bigford does not make any specific argument that the ALJ erred in failing to incorporate any of those limitations. Accordingly, Mr. Bigford has waived any argument with respect to those opinions. *See McPherson v. Kelsey*, 125 F.3d 989, 996-97 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (quotation omitted, alterations in original).

I also conclude that Mr. Bigford's argument is without merit with respect to the state agency psychologists' opinions that Mr. Bigford required reduced distractions and could not handle fast paced or strict production standards. The ALJ found that, while those opinions were generally consistent with the evidence, they were not phrased in vocational terms. (Tr. 1622). Accordingly, the ALJ limited Mr. Bigford to "simple routine tasks with no strict production rate pace requirements." (Tr. 1618).

"As a general matter, an ALJ 'is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding.'" *Cox v. Comm'r of Soc. Sec.*, No. 1:21-cv-01250, 2022 WL 6255603, at *14 (N.D. Ohio July 29, 2022), *report and recommendation adopted*, 2022 WL 4102741 (N.D. Ohio Sept. 8, 2022) (quoting *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009)). Even where an ALJ gives great weight to an opinion, "there is no requirement that an ALJ adopt an . . . opinion[] verbatim; nor is the ALJ required to adopt the . . . limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Moreover, "it may fall to the ALJ to 'convert[] and incorporate[] the limitations set forth in a medical opinion into vocationally relevant terms . . . before including those limitations in a hypothetical posed to a VE." *Stoodt v. Comm'r of Soc. Sec.*, No. 3:20-cv-02370, 2022 WL 721455, at *16 (N.D. Ohio Jan. 13, 2022), *report and recommendation adopted*, 2022 WL 716105 (N.D. Ohio Mar. 10, 2022). I conclude that the ALJ's adequately explained how he incorporated the state agency psychologists' opinions and why he included the limitations that he did. Substantial evidence therefore supports the ALJ's decision with respect to the state agency psychologists.

### ii.      *Dr. Smith*

As noted above, Dr. Smith performed a consultative psychological exam of Mr. Bigford in October 2017. Mr. Bigford argues that the ALJ found Dr. Smith's opinions persuasive but erroneously excluded Dr. Smith's opinions that Mr. Bigford could not follow written instructions,

would have difficulty relating to coworkers, and would have difficulty dealing with work pressures. Mr. Bigford is correct that the ALJ found Dr. Smith's opinion generally persuasive on these issues. (Tr. 1622-23). However, the ALJ also found that Dr. Smith's opinion was vague regarding specific limitations. *Id*. Accordingly, the ALJ incorporated Dr. Smith's opinion that Mr. Bigford would have difficulty following written instructions by limiting Mr. Bigford to simple, routine tasks with no strict production rate pace requirements. (Tr. 1622). The ALJ similarly incorporated Dr. Smith's opinion that Mr. Bigford would have difficulty with coworkers by limiting him to occasional interaction with supervisors, coworkers, and the public. (Tr. 1622-23). Finally, the ALJ incorporated Dr. Smith's opinion that Mr. Bigford would have difficulty dealing with work pressures by limiting him to routine and occasional workplace changes where changes outside the routine are explained in advance. (Tr. 1623).

As noted above, an ALJ need not incorporate an opinion from a medical source verbatim, and may instead recast the identified limitations in vocationally relevant terms. *Cox*, 2022 WL 6255603 at *14; *Stoodt*, 2022 WL 721455 at *16. Mr. Bigford has not established that the manner in which the ALJ incorporated Dr. Smith's opinion here was unsupported by substantial evidence. The ALJ thus did not err in his evaluation of Dr. Smith's opinion.

### iii.  Dr. Rivera

Dr. Rivera opined that Mr. Bigford had limitations in his ability to respond appropriately to supervision, co-workers, and work pressures; understand, remember, and carry out instructions; and maintain attention and concentration, persistence, and pace. The ALJ found that Dr. Rivera's opinion was not persuasive because it was based on Mr. Bigford's self-reports. That is an acceptable basis to discount an opinion from a medical source, as "[t]he Sixth Circuit has found that an ALJ properly discounts a medical opinion where it is based on subjective complaints." *Gasiewski v. Comm'r of Soc. Sec.*, No. 4:22-CV-002194, 2023 WL 5673034, at *9 (N.D. Ohio

Aug. 14, 2023), *report and recommendation adopted*, 2023 WL 5671936 (N.D. Ohio Sept. 1, 2023) (citing *Remias v. Comm'r of Soc. Sec.*, 690 F. App'x 356, 357 (6th Cir. 2017); *Keeler v. Comm'r of Soc. Sec.*, 511 F. App'x 472, 473 (6th Cir. 2013)); *see also Loreto v. Kijakazi*, No. 1:22-CV-1404-JDG, 2023 WL 2163440, at *10 (N.D. Ohio Feb. 22, 2023) (holding that ALJ properly discounted opinion where opinion was based on plaintiff's subjective complaints).

Mr. Bigford does not dispute that an ALJ may properly discount an opinion that is based on a claimant's self-reports. Rather, he argues that Dr. Rivera's opinion was based on her own observations and testing, rather than Mr. Bigford's subjective complaints. I disagree. Virtually every sentence of the "summary and conclusions" section of Dr. Rivera's opinion begins with some version of the phrase "the claimant reported" or "the claimant stated." (Tr. 2365-66). Dr. Rivera also expressly relied on Mr. Bigford's statements and self-reports when addressing Mr. Bigford's limitations in various functional categories. (Tr. 2366). The ALJ thus did not err in concluding that her opinion was based primarily on Mr. Bigford's own reports and did not err in discounting Dr. Rivera's opinion on that basis.[5]

### iv.  Dr. Bhandari

Mr. Bigford next argues that the ALJ erred in evaluating Dr. Bhandari's opinion because the ALJ found it persuasive but failed incorporate Dr. Bhandari's opinion that Mr. Bigford was moderately to severely impaired in his ability to sustain concentration, persist at tasks, and complete tasks in a timely fashion. As the Commissioner notes, however, the ALJ expressly found that portion of Dr. Bhandari's opinion unpersuasive, stating that the overall evidence established that Mr. Bigford was only moderately impaired in those areas. (Tr. 1623). Mr. Bigford does not

---

[5] The Commissioner also argues that Dr. Rivera's statement does not constitute a medical opinion because she did not opine on specific functional limitations, instead stating only that Mr. Bigford's symptoms "will affect" his abilities in certain functional areas. The ALJ did not reject Dr. Rivera's opinion on this basis, and I find it unnecessary to resolve the Commissioner's argument given my conclusion that the ALJ properly discounted Dr. Rivera's opinion because it was based on Mr. Bigford's self-reports.

make any specific argument that the ALJ's finding on that point was unsupported by substantial evidence, and the ALJ therefore did not err in evaluating Dr. Bhandari's opinion.

### *v.* **Dr. Balk**

Dr. Balk opined that Mr. Bigford had manipulative limitations on the right side with respect to handling, feeling, grasping, and fingering due to right hand and finger numbness. (Tr. 591). The ALJ found that Dr. Balk's opinion regarding Mr. Bigford's manipulative limitations was not supported by the overall evidence because, while Dr. Balk's own examination found decreased sensation to light touch of Mr. Bigford's third through fifth fingers, all other physical examinations in the record noted that Mr. Bigford had normal sensation in his extremities. (Tr. 1623). Mr. Bigford argues that the ALJ's conclusion was in error because other medical records corroborated Dr. Balk's opinion.

I conclude that Mr. Bigford's argument is not well-taken. As an initial matter, most of the records that Mr. Bigford cites do not relate to whether Mr. Bigford was limited in the use of his right hand or arm. Mr. Bigford notes, for example, that a June 2020 examination revealed gait problems and numbness and sensory deficits in his leg. He also notes that, in August 2022, he had diminished sensation and radiating pain in his right tibial nerve. These findings do not provide support for Dr. Balk's opinion regarding Mr. Bigford's limitations with respect to his right hand and arm.

However, Mr. Bigford is correct that a February 9, 2021 examination revealed positive Phalen and Tinel tests (both of which are tests for carpal tunnel syndrome), resulting in a diagnosis of bilateral carpal tunnel syndrome and neuropathy. (Tr. 2414-15). In light of that examination, the ALJ's statement that all other physical examinations showed normal sensation in all extremities was not completely accurate.

That being said, the fact that an ALJ misstated a piece of medical evidence does not

necessarily require remand so long as the ALJ's conclusion, as a whole, is supported by substantial evidence. *See Bragg v. Comm'r of Soc. Sec.*, No. 1:20-cv-378, 2020 WL 7769720, at *13 (N.D. Ohio Dec. 30, 2020) ("One misstated example, in light of the ALJ's extensive summary of other record evidence and the existence of other examples of how [medical source's] opinion was inconsistent with objective medical evidence, does not render the ALJ's finding unsupported by substantial evidence – even if other evidence or a preponderance of the evidence could have supported a different conclusion."); *Arthur v. Comm'r of Soc. Sec.*, No. 1:21-CV-00651-JRA, 2022 WL 566546, at *5 (N.D. Ohio Jan. 21, 2022), *report and recommendation adopted*, 2022 WL 562453 (N.D. Ohio Feb. 24, 2022) (holding that substantial evidence supported ALJ's findings regarding the impact of claimant's headaches despite the fact that the ALJ misstated the frequency of claimant's headaches because sufficient evidence supported the ALJ's conclusion despite the misstatement).

Here, while it is true that not *all* medical records showed that Mr. Bigford had normal sensation and movement in his right extremity, it is also true that other records do reflect that fact, including records the ALJ cited in his decision. (Tr. 1619). I am also cognizant that a reviewing court reads an ALJ's decision as a whole. *See Taylor v. Kijakazi*, No. 1:20-cv-01121, 2021 WL 4477865, *8 (N.D. Ohio Sept. 30, 2021). Earlier in the decision, the ALJ noted at Step Two that Mr. Bigford suffered from the non-severe impairment of carpal tunnel syndrome, thereby acknowledging that there was evidence that Mr. Bigford had difficulties in both of his upper extremities. (Tr. 1616). Thus, while the ALJ's statement that every other examination showed normal sensation in his upper extremities was incorrect, substantial evidence nonetheless supports the ALJ's conclusion that the medical evidence as a whole did not support the manipulative limitations that Dr. Balk identified.

### vi.        Other Evidence in the Medical Record

Finally, Mr. Bigford makes a general argument that the ALJ erred in failing to incorporate limitations from the medical opinions because those limitations were consistent with other treatment notes and evidence in the medical record. Mr. Bigford's argument misconstrues a court's role in an appeal from a final decision of the Commissioner. As the Sixth Circuit has held, "the Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)). For the reasons discussed above, I conclude that substantial evidence supports the ALJ's evaluation of the medical opinion evidence in this case, and I will not second-guess the ALJ's findings simply because other evidence in the record may have supported a different conclusion. I therefore recommend that the Court reject Mr. Bigford's first assignment of error.

### 2.        The ALJ's Step Four and Step Five Analysis

In his second assignment of error, Mr. Bigford argues that the ALJ erred at Steps Four and Five of the sequential evaluation process in determining that Mr. Bigford could perform his past relevant work as a commercial cleaner or other jobs existing in significant numbers in the national economy. In particular, Mr. Bigford argues that the ALJ erred because the ALJ limited him to occasional interaction with supervisors, coworkers, and the general public, which would prevent him from completing the training period that is a necessary prerequisite to obtaining any job.

"Step 4 of the sequential analysis requires the ALJ to determine whether an applicant is capable of performing [his] past relevant work." *Green v. Comm'r of Soc. Sec.*, No. 4:22-CV-

01731-DAC, 2023 WL 5831431, at *5 (N.D. Ohio Sept. 8, 2023) (citing 20 C.F.R. § 404.1520(e)). "Generally, if a claimant can perform her past relevant work, [he] is 'not disabled' and the evaluation stops." *Beyler v. Comm'r of Soc. Sec.*, No. 5:22-cv-2283, 2023 WL 7018367, at *7 (N.D. Ohio Aug. 23, 2023) (report and recommendation) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). "Where substantial evidence supports the ALJ's conclusion that a claimant can perform [his] past relevant work, the Commissioner's denial of benefits is proper." *Green*, 2023 WL 5831431 at *5.

At Step Five, "the burden shifts to the Commissioner to produce evidence as to whether the claimant can perform a significant number of jobs in the national economy." *Salata v. Comm'r of Soc. Sec.*, No. 1:20-cv-657, 2021 WL 795555, at *6 (N.D. Ohio Mar. 2, 2021) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 1520(a)(4)(v)). "The Commissioner may meet this burden by making a finding supported by substantial evidence that the claimant can perform 'specific jobs.'" *Davis v. Comm'r of Soc. Sec.*, No. 5:19-cv-2929, 2021 WL 2642953, at *10 (N.D. Ohio June 28, 2021) (quoting *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391-92 (6th Cir. 1999)). In conducting the Step Five evaluation, "[a]n administrative law judge may properly rely on a vocational expert's testimony as substantial evidence to prove a claimant's ability to perform work in the national economy." *Id.* (citing *Howard*, 276 F.3d at 238; 20 C.F.R. § 1520(a)(4)(v)).

The ALJ here determined at Step Four that Mr. Bigford could perform his past relevant work as a commercial cleaner as he actually performed it. (Tr. 1625). In the alternative, the ALJ determined that Mr. Bigford could perform other jobs existing in significant numbers in the national economy, including work as a marker; cleaner, housekeeping; or classifier. (Tr. 1625-26). Mr. Bigford argues that the ALJ's Step Four and Step Five findings are erroneous because the ALJ failed to properly account for the impact that limiting him to occasional interactions with

supervisors and coworkers would have on his ability to complete the training period for either his past work or the additional jobs that the VE identified. In particular, Mr. Bigford focuses on the following exchange between his counsel and the VE:

> Q: Do any of these jobs involve a training or probationary period?
>
> A: Yes, they all would. Typically, training for these types of jobs lasts typically for no more than about a week.
>
> Q: And is training conducted by supervisors or coworkers? Who does training in these jobs?
>
> A: Depending on the facility, a lot of times, it's a coworker that the person would be assigned to. They would give a demonstration of how the work is performed, maybe check on them throughout the day, once the demonstration is over, and see if they have any questions or things of that nature. These are very simple, routine, repetitive. So, not a whole lot of training required. But they would usually be assigned to a coworker.
>
> Q: So during that first week, if an individual is limited to only occasional interaction with a coworker or supervisor, could they get through that week of training, or would they need to be able to interact more?
>
> A: A person would be expected, during the training period, as far as the job requirements, to be able to interact more than occasionally with a supervisor or coworkers. So, if they are unable to do that, then they wouldn't make it through the training and would not get the job, in my opinion, sir.

(Tr. 1667-68).

In his brief, Mr. Bigford appears to go one step further, arguing that a limitation to occasional interactions precludes him from performing *any* job in the national economy, not just Mr. Bigford's past work or the specific jobs that the VE identified. *See* ECF No. 7, PageID # 5544 ("Based on the ALJ's limitation to only occasional interaction, Plaintiff would be unable to complete training necessary for even an unskilled job. Since there were no jobs such a person could perform in the national economy, including Plaintiff's past work, it was harmful error for the ALJ to find that Plaintiff was not disabled.")

Mr. Bigford is not the first claimant in this circuit to argue that a social interaction

limitation is work-preclusive because it prevents the claimant from completing the training and/or probationary period for any potential job. As another court has noted, Mr. Bigford's argument is potentially "sweeping and categorical in nature—that the mere occasional limits on social interaction preclude all work due to the modern workforce's reliance on training and probationary periods." *Kidd v. Berryhill*, No. 5:17-CV-420-REW, 2018 WL 3040894, at *7 (E.D. Ky. June 19, 2018). The *Kidd* court characterized the argument as "quite extreme," *id*. at *6, and courts have rejected it either where the claimant failed to properly raise it with the VE during the hearing or where the ALJ directly addressed the argument in the hearing decision. *See id*. at *11; *Burdine v. Comm'r of Soc. Sec.*, No. 1:17-cv-1133, 2019 WL 1349486, at *4 (W.D. Mich. Mar. 26, 2019) (rejecting argument where the ALJ considered plaintiff's argument and evidence and accepted the VE's testimony and interpretation of the occupational issues); *Roberts v. Comm'r of Soc. Sec.*, No. 2:18-cv-00541, 2019 WL 4023549, at *8 (S.D. Ohio Aug. 26, 2019) (rejecting "less than impressive and unsubstantiated" post-hearing opinion stating that occasional interaction limitation precluded all work because training and probationary period for any job would require more than occasional interactions with others).

Even under the narrower version of Mr. Bigford's argument focused solely on his past work and the specific jobs the VE identified, I conclude that substantial evidence supports the ALJ's decision. The ALJ directly addressed the VE's testimony regarding the training period, finding as follows:

> The claimant also testified at his hearing that he has trust issues and therefore, spends about 90% of his time away from people, isolating at least four days week. As such, the claimant's representative asked the vocational expert whether the jobs he cited that the claimant can perform would require a training period where there would be more than occasional interaction with supervisors and coworkers. However, while the overall evidence indicates that the claimant is limited to occasional interaction with supervisors, coworkers and the public, the evidence does not indicate that the claimant would not be able to tolerate increased interaction for a brief period of time during training. Further, the

38

> vocational expert testified that training for the types of jobs he cited usually only lasts for one week and is done through demonstration and periodic checkups to see how the claimant is doing (Exhibit D4F, p. 8).

(Tr. 1621).

I conclude that the ALJ's decision that Mr. Bigford could handle greater than occasional interaction for a brief training period was supported by substantial evidence. Notably, the ALJ was not required to find that Mr. Bigford was incapable of completing the training or probationary period simply because the VE testified that the training period would require more than occasional interaction with coworkers or supervisors. Rather, "it was the ALJ's function to first determine what medical restrictions [a] claimant [is] under and how they affect[] his residual functional capacity, and then to determine whether the vocational expert ha[s] identified a significant number of jobs . . . given these restrictions." *Maziarz v. Sec'y of Health & Human Servs*., 837 F.2d 240, 247 (6th Cir. 1987).

Moreover, reading the decision as a whole, *see Taylor*, 2021 WL 4477865 *8, the ALJ provided sufficient support for his conclusion that Mr. Bigford was not so limited in his ability to interact with others that he would be unable to complete a one-week training period. Earlier in the decision, for example, the ALJ noted that treatment records reflect that he has friends and had girlfriends in the past, and that mental status exams described him as cooperative. (Tr. 1617). The ALJ also noted that Mr. Bigford was cooperative during his consultative psychological examination with Dr. Smith. (Tr. 1620). The ALJ further noted that, despite treatment records indicating that Mr. Bigford has symptoms including mood swings, anger, irritability, insomnia, low energy, and a tendency to isolate, his mental status examinations were often normal. (Tr. 1620). Thus, while other evidence in the record may have supported a different conclusion, substantial evidence supported the ALJ's finding that Mr. Bigford could tolerate increased social interaction for a brief period of time during training. I therefore recommend that the Court reject

 Mr. Bigford's second assignment of error.

## VI.     RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

Dated: <u>January 25, 2024</u>                             *s/ Jennifer Dowdell Armstrong*
                                                            Jennifer Dowdell Armstrong
                                                            U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and

recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).